**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| April Michelle Franklin, | ) | Case No.: 05-01310-BGC-7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Buddy Mahaffey & | | |
| Michael Antonio, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | AP No.: 05-00158-BGC-7 |
| | ) | |
| April Michelle Franklin, | ) | |
| | ) | |
| Defendant. | ) | |

**Memorandum Opinion
on the Complaint to Determine Dischargeability
under Sections 523(a)(5) and 523(a)(15)**

### I. Background

The matter before the Court is the <u>Complaint to Determine Dischargeability of Debt Under 11 U.S.C. § 523(a)(5) and § 523(a)(15)</u> filed on July 7, 2005. After notice, a trial was held on November 17, 2005. Appearing were both plaintiffs, Mr. Buddy Mahaffey and Mr. Michael Antonio; their attorney, Mr. Ted Stuckenschneider; the defendant-debtor, Mrs. April Michelle Franklin; and her attorney, Ms. Sherri C. Friday.

The matter was submitted on the testimony of Mr. Mahaffey, Mr. Antonio, Mrs. Franklin, and Mr. Larry Franklin, Jr., Mrs. Franklin's husband; exhibits admitted into evidence; the record in this adversary proceedings; the record in Bankruptcy Case No. 05-00158-BGC-7; and the arguments and briefs of counsel. Based on the evidence, the Court concludes the relief sought by the plaintiffs is due to be denied.

### II. Findings of Fact

While they were married, the plaintiff Mr. Antonio and the defendant Mrs. Franklin borrowed $25,000 from America's First Credit Union on May 6, 2002. The note

for that debt provides for repayment with interest at the rate of 11.8% per annum, in 71 equal, consecutive monthly installments of $500 each, plus a final installment of $465.45. The first installment payment became due on June 10, 2002, and the last installment payment was due to have been paid on May 10, 2008.

Both Mr. Antonio and Mrs. Franklin signed the note, as did Mr. Mahaffey, Mr. Antonio's stepfather. Mr. Mahaffey executed the note solely as surety. That fact was clearly demonstrated by Mr. Mahaffey's testimony and by the document attached to the note entitled "Notice to Cosigner," which was provided to Mr. Mahaffey by America's First and signed by him on the date that he, Mr. Antonio, and Mrs. Franklin executed the note.

Mr. Antonio and Mrs. Franklin were divorced on May 15, 2003. They entered into a divorce settlement agreement. In summary, that agreement provided the following:

1. Neither would claim alimony from the other and each waived his or her right, if any, to receive or obtain alimony from the other.

2. Mrs. Franklin was awarded custody of the parties' two minor children. Mr. Antonio was awarded visitation privileges and directed to pay $616.74 each month to Mrs. Franklin for child support. The divorce decree was subsequently modified on December 28, 2004, to reduce the amount payable as child support by Mr. Antonio each month to $500 (at least that is what the order entered in the state court divorce proceeding reflects.) See Plaintiff's Exhibit 24B. The testimony reflects, however, that Mr. Antonio's support obligation was reduced to $480.50 monthly. Even more puzzling, Mr. Antonio's current pay stubs reflect that only $461.54 is being deducted from his wages each month for child support.

3. Mr. Franklin was required to continue providing health insurance coverage through his employment for the children. But, Mrs. Franklin and he would each be required to pay one-half of any expenses not covered by the insurance. If Mr. Antonio changed employment where medical insurance was not offered, Mrs. Franklin and he would be equally responsible for any medical and dental expenses incurred for the children or cost of health insurance for the children.

4. The marital residence of the parties' would be sold and the proceeds would be divided equally between them. Until the sale was completed, Mr. Antonio would continue to live in the house, and Mrs. Franklin and he would each be responsible for paying one-half of the monthly mortgage payment. The divorce decree was modified on December 28, 2004, to eliminate Mrs. Franklin's interest in the marital residence and to make Mr. Antonio solely responsible for the mortgage debt.

5. Mr. Antonio would keep his personal property and Mrs. Franklin would keep hers. All other personalty of the marriage, other than what remained in the marital

2

residence, had been divided by the parties. Whatever personalty of the marriage that remained in the marital residence would be divided equally between the parties when the residence was sold.

6. Mr. Antonio was awarded the parties' 1993 Ford Ranger automobile and was required to pay whatever indebtedness was owed on it. Mrs. Franklin was awarded the parties' 2000 Saturn automobile and required to pay whatever indebtedness was owed on it.

7. Each party would be solely responsible for paying any debts which he or she had incurred in his or her own name. Both would be equally responsible for paying the debt owed to America's First, with each paying one-half of each monthly payment as it came due. It is represented in the agreement that the amount then due on that debt was $23,153.

8. Mrs. Franklin would be solely responsible for paying the balance then due on the parties' "Citi Visa credit card."

9. Mr. Franklin would be responsible for paying the attorney's fees incurred in connection with the divorce.

Plaintiff's Exhibit 24.

At the time of the divorce, Mr. Antonio was earning $22 an hour working for United Parcel Service. That amount equals about $3,520 a month, on a gross basis. By comparison, Mrs. Franklin was earning about the same as she earns now, that is $2,248 to $2,524 a month, on a gross basis.

On January 11, 2005, Mr. Antonio was fired from his job at UPS. Mrs. Franklin filed her Chapter 7 petition on February 9, 2005. In March 2005, after receiving notice from America's First that the note he had signed as surety for Mr. Antonio and Mrs. Franklin was in default, Mr. Mahaffey borrowed $27,590.61 from Regions Bank. On March 31, 2005, he used part of that borrowed money to pay the balance owed on the America's First note, which was, at that time, $16,531.21. Prior to satisfying that debt in full, he had been forced to make payments totaling $1,000 on behalf of Mrs. Franklin because she had failed to make her part of the December 2004 and January 2005 payments.

The plaintiffs instituted the present adversary proceeding on July 7, 2005. A day later, at Mr. Mahaffey's behest, Mr. Antonio executed a promissory note, payable on demand, to Mr. Mahaffey, for $27,590.61. According to Mr. Mahaffey, the note includes the entire amount he paid to satisfy the debt owed by both Mr. Antonio and Mrs. Franklin to America's First, not just the one-half for which Mr. Antonio is responsible. It also includes about $3,750 which he has paid to his attorney in the present proceeding, another $250 which he paid to another attorney to pursue collection from Mrs. Franklin

3

of her part of the America's First debt, and about $5,000 in otherwise undescribed debts which his stepson owes him. Mr. Antonio is making payments on the note he executed to Mr. Mahaffey at a rate of about $325.12 each month. He makes those payments directly to Regions Bank.

The note executed by Mr. Antonio mirrors the amount of the note which Mr. Mahaffey gave to Regions Bank when he borrowed the money from Regions in March 2005. Moreover, the payments which Mr. Antonio currently makes to Regions on behalf of Mr. Mahaffey, mirror the amount of the monthly payments that Mr. Mahaffey is required to make to Regions pursuant to his note. In essence, Mr. Antonio is making Mr. Mahaffey's note payments, albeit for debts on which Mr. Antonio is responsible.

### III. Contentions

The plaintiffs contend that Mrs. Franklin's: (1) obligation to pay one-half of the debt formerly owed to America's First, now owed to Mr. Mahaffey by way of subrogation, and (2) her indemnification of Mr. Antonio with respect to one-half of that debt, as required by the divorce agreement, are not dischargeable by virtue of section 523(a)(5) of the Bankruptcy Code. 11 U.S.C. § 523(a)(5).

The plaintiffs also contend the disputed debts should not be excepted from discharge under section 523(a)(15) as part of the parties' property settlement because the debtor has the ability to pay them and the detriment to Mr. Antonio from nonpayment of the debts outweighs the benefit to Mrs. Franklin if the debts are discharged. 11 U.S.C. § 523(a)(15)

The debtor contends that the debts are not in the nature of alimony or support and should not be excepted from discharge as part of the parties' property settlement.

### IV. Issue and Burdens of Proof

Are the debts dischargeable? Whether the disputed debts are dischargeable depends on whether the debts are either debts in the nature of alimony, maintenance, or support under section 523(a)(5) of the Bankruptcy Code or whether they are considered part of the parties' property settlement under section 523(a)(15) of the Bankruptcy Code.

If a debt is in the nature of alimony, maintenance, or support, it is not dischargeable. The party objecting to the discharge of debts that may be in the nature of alimony, maintenance, and support has the burden of proof on that issue.

If a debt is part of the parties' property settlement, it may or may not be dischargeable depending on the parties' financial circumstances. Subsection 523(a)(15) makes property settlement obligations nondischargeable where the debtor has the ability to pay them and the detriment to the nondebtor spouse from

4

nonpayment of the debts outweighs the benefit to the debtor of discharging the debts. The debtor has the burden to prove that a property settlement debt under section 523(a)(15) is dischargeable.

**VI. Additional Findings of Fact**
**and**
**Conclusions of Law**

**A. Section 523(a)(5)**

Section 523(a)(5) provides, in relevant part:

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that...

(B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support....

11 U.S.C. § 523(a)(5).

The first issue then is whether payment of one-half of the America's First debt, and the indemnification of Mr. Antonio for that debt, are obligations actually in the nature of alimony, maintenance or support. If they are, they are not dischargeable. If they are not, the Court must consider whether they are not dischargeable as part of the parties' property settlement.

Writing for the Court of Appeals for the Eleventh Circuit in Cummings v. Cummings, 244 F.3d 1263 (11th Cir. 2001), Circuit Judge Phyllis A. Kravitch explained:

Whether a given debt is in the nature of support is an issue of federal law. In re Strickland, 90 F.3d 444, 446 (11th Cir.1996). Although federal law controls, state law does "provide guidance in determining whether the obligation should be considered 'support' under § 523(a)(5)." Id. To make this determination a bankruptcy court should undertake "a simple inquiry as to whether the obligation can legitimately be characterized as support, that is, whether it is in the nature of support." In re Harrell, 754 F.2d at 906.

5

Id. at 1265.

Judge Kravitch adds:

> In conducting this inquiry, a court cannot rely solely on the label used by the parties. As other courts have recognized, " 'it is likely that neither the parties nor the divorce court contemplated the effect of a subsequent bankruptcy when the obligation arose.' " In re Gianakas, 917 F.2d 759, 762 (3d Cir.1990) (citation omitted). The court must therefore look beyond the label to examine whether the debt actually is in the nature of support or alimony. Id. A debt is in the nature of support or alimony if at the time of its creation the parties intended the obligation to function as support or alimony.

Id. (citations omitted). And finally Judge Kravitch explains, "In determining whether a particular obligation is in the nature of support, "[a]ll evidence, direct or circumstantial, which tends to illuminate the parties subjective intent is relevant." In re Brody, 3 F.3d at 38." Id. at 1266.

The basis of an award of future spousal support in a divorce decree, whether the same is labeled alimony, maintenance, support, or otherwise, is one spouse's relative need for financial support and the other spouse's relative financial ability to provide the same. "In simple terms, alimony may be awarded when one spouse needs to be supported and the other spouse is able to provide support. The respective needs and abilities are determined by comparing the income, earning power, future prospects, age, health, station in life, length of the marriage, and other factors." Hughes v. Hughes (In re Hughes), 16 B.R. 90, 92 (Bankr. N.D. Ala. 1981). "[E]ither the husband or wife may be granted payment of alimony from the other upon a showing of requisite need by one together with the requisite ability to pay by the other." Thompson v. Thompson, 377 So.2d 141, 143 (Ala. Civ. App. 1979). "Periodic alimony has as its sole object the support of the... [dependent former spouse]. Accordingly, it may be terminated when the dependent former spouse is self-supporting, since the object for which it was granted no longer exists." Allen v. Allen, 477 So.2d 457, 458 (Ala. Civ. App. 1985) (parenthetical added.)

Indeed, the relevant Alabama statute which authorizes such an award requires, as a prerequisite, financial inability on the part of the recipient spouse to support himself or herself. That statute reads in part:

> If either spouse has no separate estate or if it is insufficient for the maintenance of a spouse, the judge, upon granting a divorce, at his or her discretion, may order to a spouse an allowance out of the estate of the other spouse, taking into consideration the value thereof and the condition of the spouse's family.

6

Code of Ala., 1975, § 30-2-51.

In this case, Mr. Antonio did not present any evidence that at the time the parties divorced, he was financially unable to support himself, or that his ability to financially support himself was inferior to Mrs. Franklin's ability to support herself, or that he would, after the divorce, have been unable to support himself absent financial assistance from Mrs. Franklin.[1]  To the contrary, when the divorce occurred, Mr. Antonio was earning around $1,000, and sometimes greater, each month <u>more</u> than Mrs. Franklin.

Similarly, there was no evidence that when the parties divorced, Mrs. Franklin had the financial ability to contribute to Mr. Antonio's support, or that her financial status at the time permitted her to do anything more than support herself and her two children. She was making considerably less money than he.  And she had in addition the two children to support.  Even with the addition of the child support that she was to receive from Mr. Antonio, the amount of her monthly income rose only to a level roughly equivalent to his.  And, while he had himself to care for, she had herself and the two children.

Similarly, there is no evidence that Mr. Antonio would have been unable to support himself, or would have been less able to support himself than Mrs. Franklin, had Mrs. Franklin not agreed to pay one-half of the America's First debt.  Even after reducing Mr. Antonio's monthly income by the amount of that $250 one-half payment, and the $617 in child support he would be required to pay Mrs. Franklin, his income was still more than sufficient to support himself, especially since he was then single, and still in a more advantageous financial position than Mrs. Franklin, who again had to provide for the children.

Based on the above, the Court finds that the parties did not intend for either Mrs. Franklin's agreement to pay one-half of the America's First debt, or her agreement to indemnify Mr. Franklin for that, to be an obligation actually in the nature of alimony, maintenance or support.

Other inferences support this conclusion.  The divorce decree essentially split everything equally between the parties, including the personal property, real property, and the marital debts.  If Mr. Antonio had needed the support from Mrs. Franklin as he contends, and the parties provided for that support as he contends, then the property settlement, including the division of debts, would have then been quite unequal.  Mr. Antonio would then been receiving more property and remaining liable for less debts than Mrs. Franklin.

---

[1] The determination of whether the debts are in the nature of alimony or support should be made by examining the debt as of the time it was created.  <u>Matter of Swate</u>, 99 F.3d 1282, 1286 (5th Cir. 1996).

Case 05-00158-BGC    Doc 31    Filed 03/29/06    Entered 03/29/06 14:36:00    Desc Main
Document    Page 7 of 24

Moreover, there is a specific mechanism under Alabama law where parties can provide for one spouse to provide future support to another from current income. That mechanism is the payment of "periodic alimony." "Periodic alimony in Alabama 'is an allowance for the future support of the [recipient spouse] payable from the current earnings of the [paying spouse].'" Taylor v. Taylor, 890 So.2d 151, 156 (Ala. Civ. App. 2004)(quoting Ex parte Hager, 293 Ala. 47, 55, 299 So.2d 743, 750 (1974). These parties could have specifically made such a provision in their agreement, but they did not. They did however, provide for the opposite. In the divorce agreement, Mr. Antonio disclaimed and waived any right he may have had to receive periodic alimony from Mrs. Franklin, and vice versa. The decree reads in part, "Wife and Husband claim no alimony either pendente lite, permanent, periodic, in gross, or rehabilitative, and waive any claim they might have thereto in this divorce action." Plaintiff's Exhibit 24 at 3, para. 10.

The plaintiffs argue that Mrs. Franklin's obligation to pay one-half of the America's First debt is necessarily in the nature of support for Mr. Antonio because Mr. Antonio and Mrs. Franklin used the funds which they received from America's First in part to pay off a number of smaller debts they incurred together for household expenses.

This Court is not aware of any legal support for that argument, and expects that if there were one, it would be contrary to the requisites for nondischargeability under section 523(a)(5) and Alabama cases which define the nature of and requisites to an award of spousal support. For example, an obligation imposed by a divorce decree to pay one-half of a debt incurred by a couple during the course of their marriage for the purpose of consolidating debts which they have incurred to provide for their mutual support and for the support of their children is not in fact periodic alimony or spousal support. Periodic alimony or spousal support may be awarded only if the recipient spouse needs to be supported and the paying spouse is able to provide support. If those criteria are met, the paying spouse's obligation to pay a particular debt of the marriage, and to hold the recipient spouse harmless with respect to the same, may be considered "actually in the nature of alimony, maintenance, or support," regardless of the nature or make-up of the debt that the paying spouse must pay. And if those criteria are not satisfied, the obligation is not actually in the nature of support, regardless of the nature or make-up of the debt that the paying spouse must pay. Consequently, the nature or make-up of the debt that the paying spouse must pay is irrelevant to the inquiry.

The plaintiffs also claim that Mrs. Franklin's obligation to pay one-half of the America's First debt is necessarily in the nature of support for Mr. Antonio because the divorce agreement contains the following language:

> 3. With respect to each party's responsibility for payment of certain debts and liabilities, and their obligation to hold the other harmless for the payment thereof, the parties understand and agree that their obligation is

8

a nondischargeable debt under the Bankruptcy Code, this obligation being part of the final financial support settlement for both parties.

Plaintiff's Exhibit 24 at 2, para. 3.

As cited above, the label given to an obligation by the parties in their divorce agreement does not govern its dischargeability under section 523(a)(5). Judge Kravitch wrote, "The court must... look beyond the label to examine whether the debt actually is in the nature of support or alimony." Cummings v. Cummings, 244 F.3d at 1265. Therefore, just because these parties called an obligation "support" and agreed that the "support" was "a nondischargeable debt under the Bankruptcy Code," is not binding on this Court. This has apparently been the law in this Circuit for some time.[2] Therefore, merely because Mr. Antonio and Mrs. Franklin referred to their obligations to pay one-half of the America's First debt as "support" does not establish those obligations as such for purposes of section 523(a)(5).

The result is similar in regard to the parties' agreement that the debt is "a nondischargeable debt under the Bankruptcy Code," that is, the parties' agreement does not change the applicable law. In regard to dischargeability, sections 524(a)(1) and 524(a)(2) of the Bankruptcy Code specifically provide that a discharge effectively extinguishes an otherwise dischargeable debt, even if the debtor has endeavored to waive the discharge of that debt.[3] The vast majority of courts publishing opinions on

---

[2] In Davidson v. Davidson (In re Davidson), 947 F.2d 1294 (5th Cir. 1991), Circuit Judge Jerry E. Smith wrote, "A division of marital property in payments over time will not be declared nondischargeable in bankruptcy merely because the parties have labeled it 'alimony.'" Id. at 1296. And in Hughes v. Hughes (In re Hughes), 16 B.R. 90 (Bankr. N.D. Ala. 1981), Judge Stephen B. Coleman wrote, "In short, when determining the nature of an obligation, 'a Court should look to the substance of the obligation, and not to labels imposed by state law' or imposed by language in the agreement itself. Id. at 92.

[3] Sections 524(a)(1) and (a)(2) read:

(a) A discharge in a case under this title--

(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727, 944, 1141, 1228, or 1328 of this title, **whether or not discharge of such debt is waived**;

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, **whether or not discharge of such debt is waived**; and

11 U.S.C.A. § 524 (emphasis added).

9

this question have declared something similar to that stated by the court in <u>In re Nieves</u>, 246 B.R. 866 (Bankr. E.D. Wis. 2000), that is, "A debtor may not contract away the right to a discharge in bankruptcy." <u>Id</u>. At 872.  Accord, <u>Klingman v. Levinson</u>, 831 F.2d 1292, 1296 n.3 (7th Cir. 1987); <u>Chilcoat v. Minor (In re Minor)</u>, 115 B.R. 690, 693 (D. Colo.1990); <u>Lewis v. Trump (In re Trump)</u>, 309 B.R. 585, 593 (Bankr. D. Kan. 2004); <u>Hester v. Daniel (In re Daniel)</u>, 290 B.R. 914, 923 (Bankr. M.D. Ga. 2003); <u>Marra, Gerstein & Richman v. Kroen (In re Kroen)</u>, 280 B.R. 347, 351 (Bankr. D.N.J. 2002); <u>Freeman v. Freeman (In re Freeman)</u>, 165 B.R. 307, 312 (Bankr. S.D. Fla. 1994); <u>Doug Howle's Paces Ferry Dodge, Inc. v. Ethridge (In re Ethridge)</u>, 80 B.R. 581, 586 (Bankr. M.D. Ga. 1987); <u>Alsan Corp. v. DiPierro (In re DiPierro)</u>, 69 B.R. 279, 282 (Bankr. W.D.Pa. 1987); <u>Markizer v. Economopoulos (In re Markizer)</u>, 66 B.R. 1014, 1018 (Bankr. S.D. Fla. 1986); <u>Bisbah v. Bisbah (In re Bisbah)</u>, 36 B.R. 350, 352 (Bankr. W.D. Wis. 1984); <u>In re Tru Block Concrete Products, Inc.</u>, 27 B.R. 486, 492 (Bankr. S.D. Cal. 1983).

State courts agree.  Writing for the court in <u>Laminack v. Laminack</u>, 675 So.2d 479 (Ala. Civ. App. 1996), Judge John B. Crawley explained:

> The statement that the alimony in gross is nondischargeable in bankruptcy has no bearing on our decision that the second mortgage is more in the nature of a property settlement and thus is dischargeable in bankruptcy.  Parties cannot determine the dischargeability or nondischargeability of an obligation.  This is a legal question that a court must resolve.

<u>Id</u>. at 481 n.1.

In another case, the Alabama Court of Civil Appeals found that the inclusion of such nondischargeability language in a divorce agreement with regard to a particular obligation has the opposite result.  The opinion in <u>Blackburn v. Blackburn</u>, 675 So.2d 444 (Ala. Civ. App. 1996) suggests that the obligation was not intended to constitute periodic alimony or support because if that had been the parties' intent, then the inclusion of such language would have been unnecessary since periodic alimony and support are automatically nondischargeable without the necessity of any such language.  Writing for the court William E. Robertson explained:

> Obligations to pay alimony in gross are dischargeable in bankruptcy. Obligations to provide periodic alimony, maintenance, and support for a spouse, however, are not dischargeable in bankruptcy.  If the husband had intended the payments of $75 per week for three years to be periodic alimony, it would not have been necessary for the husband to acknowledge that the <u>alimony</u> obligation would not be dischargeable in bankruptcy.

<u>Id</u>. at 446.

10

Consequently, this Court finds that a provision in a divorce agreement where the debtor purports to waive his or her right to discharge an obligation created in that agreement, is, as against public policy, void and unenforceable. See Lewis v. Trump (In re Trump), 309 B.R. at 593; Hester v. Daniel (In re Daniel), 290 B.R. at 923; Freeman v. Freeman (In re Freeman), 165 B.R. at 312; Markizer v. Economopoulos (In re Markizer), 66 B.R. at 1018; Bisbah v. Bisbah (In re Bisbah), 36 B.R. at 352.

The plaintiffs also point to language in the parties' divorce agreement in which the parties stipulate that their obligations to pay one-half of the America's First debt are obligations enforceable by contempt. The language in the agreement reads, "If either party defaults on said debt, the default will constitute a breach of this agreement, and will subject the breaching party to a contempt citation." Plaintiff's Exhibit 24 (page 7, paragraph 22). In support of this interpretation, the plaintiffs direct the Court to Cummings v. Cummings, 244 F.3d 1263, 1265-1266 (11th Cir. 2001), where the court discusses whether a default in a particular provision of a divorce decree may be punishable by contempt. This Court disagrees that Cummings supports the plaintiff's contention, or even that "contempt" is an issue, other than as a factor in determining the parties' intent.

First, the parties to a divorce agreement may not by contractual edict establish that a particular obligation created therein is punishable by contempt. Instead, state law determines whether or not the breach of the obligation is punishable by contempt. Therefore, the parties' contractual declaration in this case does not establish that the breach of their obligations to pay one-half of the America's First debt are enforceable by contempt.

Second, as the court clearly indicated in Cummings, whether or not a default in a particular provision of a divorce decree may be punishable by contempt is merely one of the circumstances which courts are free to consider when attempting to "illuminate" the intent of the parties with respect to the divorce decree. Id. Regardless of the presence or absence of any of those circumstances, however, the Eleventh Circuit cautioned that, "the touchstone for dischargeability under § 523(a)(5) is the intent of the parties." Id. Consequently, whether or not the default is punishable by contempt is insignificant if the court determines that the obligation was not intended as alimony, maintenance, or support. Indeed, in Cummings, the trial court determined that the obligation in question was not actually in the nature of alimony, maintenance, or support because it was not enforceable under state law by contempt and, furthermore, possessed other characteristics of a state law property settlement. The appeals court vacated and remanded, however, after concluding that regardless of how much the obligation in question resembled a state law property settlement, it was, according to the evidence, actually intended to act in part as support for the receiving spouse. Id.

In the instant proceeding, this Court has determined that Mrs. Franklin's obligation to hold Mr. Antonio harmless with respect to one-half of the America's First debt is not in the nature of alimony, maintenance, or support for Mr. Antonio. It

11

therefore makes no difference that the parties, in their divorce agreement, referred to that obligation as support, that they stipulated that the obligation would not be dischargeable in bankruptcy, or that they stipulated that the obligation would be enforceable by contempt.

Based on the above, the Court finds that the parties did not intend for Mrs. Franklin's agreement to pay one-half of the America's First debt, or to indemnify Mr. Antonio for that debt, to be an obligation actually in the nature of alimony, maintenance or support, and that those obligations are, factually and legally, not in the nature of alimony, maintenance or support under section 523(a)(5).

## B. Section 523(a)(15)

If the debt is not excepted from discharge because it is not in the nature of alimony or support, is it excepted because it is part of the parties' divorce property settlement?

The plaintiffs contend that Mrs. Franklin's obligation to pay one-half of the debt formerly owed to America's First, now owed to Mr. Mahaffey by way of subrogation, and her obligation to indemnify Mr. Antonio with respect to one-half of that debt, as required by the divorce agreement, are nondischargeable by virtue section 523(a)(15). 11 U.S.C. § 523(a)(15).

As explained above, section 523(a)(15) concerns the dischargeability of debts that arise as part of parties' domestic property settlements. If a debt is part of the parties' property settlement, it may or may not be dischargeable depending on the parties financial circumstances.

Section 523(a)(15) provides, in relevant part:

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –

(15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless...

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

Case 05-00158-BGC    Doc 31    Filed 03/29/06    Entered 03/29/06 14:36:00    Desc Main
Document      Page 12 of 24

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

11 U.S.C. § 523(a)(15).

Debts subject to section 523(a)(15) are by definition – not dischargeable.  If the debtor can prove that <u>one of two</u> above exceptions apply, a debt may be discharged.[4] In deciding whether the Debtor has met that burden, this Court should consider the parties' financial conditions as they existed around the time the bankruptcy petition was filed or the time of trial, not as they existed at the time the divorce decree was entered. As the Court in <u>In re Hill</u>, 184 B.R. 750 (Bankr. N.D. Ill.1985) noted, "This measuring point differs from the one for cases brought under Section 523(a)(5), where the measuring point is the time of the entry of the divorce decree." <u>Id</u>. at n. 13 (citing <u>In re Szuch</u>, 117 B.R. 296, 301 (Bankr. N.D. Ohio 1990); <u>In re Fahland</u>, 110 B.R. 431, 432 (Bankr. E.D. Mo.1990). The reason for the different points of reference is clear, subsection (a)(15) is measured in terms of a debtor's current ability to pay or measured in terms of a comparison of the parties' current financial conditions.[5]

Notwithstanding the above, because of the unusual procedural posture of this proceeding, this Court must first address the issue of Mr. Mahaffey's standing to prosecute a section 523(a)(15) complaint.

### 1.  Does Mr. Mahaffey Have Standing under Section 523(a)(15)?

The majority of courts which have addressed similar issues has determined that only the parties to the divorce action have standing to prosecute a proceeding to declare the nondischargeability of a debt pursuant to section 523(a)(15).[6]

_____

[4] A debt may be discharged under Section 523(a)(15) <u>if either of two conditions exist</u>. If under Section 523(a)(15)(A) a debtor does not have the ability to pay a certain debt <u>or</u> if under 523(a)(15)(B) the benefit to a debtor from a discharge of that debt outweighs the detrimental consequences to a non-debtor spouse, the debt captured by section 523 should be discharged. See this Court's opinion in <u>In re Anthony</u>, 190 B.R. 429, 430 (Bankr. N.D. Ala. 1995).

[5] See this Court's opinion in <u>In re Anthony</u>, 190 B.R. 433, 438 (Bankr. N.D. Ala. 1995). The point is, current financial information is more appropriate for a section 523(a)(15) determination as opposed to conditions that existed at the time of the divorce.  In this proceeding, much of the debtor's financial information comes from the debtor's August 2005 deposition (Plaintiff's Exhibit 13) and a list of expenses that she supplied in connection with that deposition (Plaintiff's Exhibit 19.)

[6] <u>Baroway & Dawson, P.C. v. Euell (In re Euell)</u>, 271 B.R. 388, 392 (Bankr. D. Col. 2002); <u>Bryant v. Bryant (In re Bryant)</u>, 260 B.R. 839, 848 (Bankr. W.D. Ky. 2001); <u>Savage,</u>

13

This Court agrees.  The language of the statute is clear.  It excepts from discharge a, "debt... that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record ...."  11 U.S.C. § 523(a)(15).  A "debt" is defined in the bankruptcy code as "liability on a claim."  11 U.S.C. § 101(12).  A "claim" is defined as a "right to payment...."  11 U.S.C. § 101(5)(A).

Mrs. Franklins's "debt" to Mr. Mahaffey was not "incurred by [Mrs. Franklin] in the course of [her] divorce or separation or in connection with [her] separation agreement [or] divorce decree...."  Consequently, Mr. Mahaffey's claim, "or right to payment," did not arise in connection with the parties' divorce.  His claim arose by virtue of his payment of America's First note and concomitant subrogation to the right of that creditor to receive payment from Mrs. Franklin.  Mrs. Franklin "incurred" that "debt" by virtue of her execution of the note in favor of America's First over a year prior to her divorce from Mr. Antonio.  The only "debt" which Mrs. Franklin incurred in connection with her divorce agreement was the obligation to hold her ex-husband harmless with respect to one-half of the America's First debt.  That obligation is owed to Mr. Antonio, not Mr. Mahaffey.  Consequently, Mr. Mahaffey lacks standing to institute and prosecute a nondischargeability proceeding pursuant to 523(a)(15).

The legislative history of section 523(a)(15) supports these conclusions.  That history reflects that Congress specifically intended for 523(a)(15) to be asserted only by the parties to the divorce, and that non-spouse creditors would not have standing to assert the exception.  The history reads in part:

> The exception applies only to debts incurred in a divorce or separation that are owed to a spouse or former spouse, and can be asserted only by the other party to the divorce or separation.  If the debtor agrees to pay marital debts that were owed to third parties, those third parties do not have standing to assert this exception, since the obligations to them were incurred prior to the divorce or separation agreement.  It is only the obligation owed to the spouse or former spouse an obligation to hold the spouse or former spouse harmless which is within the scope of this section.

---

Herndon & Turner v. Sanders (In re Sanders), 236 B.R. 107, 110 (Bankr. S.D. Ga. 1999); Brian M. Urban Co. v. Wenneman (In re Wenneman), 210 B.R. 115, 119 (Bankr. N.D. Ohio 1997); Woodruff, O'Hair & Posner, Inc. v. Smith (In re Smith), 205 B.R. 612, 617 (Bankr. E.D. Cal. 1997); Abate v. Beach (In re Beach), 203 B.R. 676, 680 (Bankr. N.D. Ill. 1997); Woloshin, Tenenbaum, & Natalie, P.A. v. Harris (In re Harris), 203 B.R. 558, 562 (Bankr. D. Del. 1996); Douglas v. Douglas (In re Douglas), 202 B.R. 961, 963 (Bankr. S.D. Ill. 1996); Dressler v. Dressler (In re Dressler), 194 B.R. 290, 304 (Bankr. D.R.I. 1996); Barstow v. Finaly (In re Finaly), 190 B.R. 312, 315 (Bankr. S.D. Ohio 1995).

14

H.R. REP. 103-835, H.R. Rep. No. 835, 103RD Cong., 2ND Sess. 1994, reprinted in 1994 U.S.C.C.A.N. 3340, 3364, 1994 WL 562232, *55 (Leg.Hist.).

Because Mr. Mahaffey does not have standing to assert the exception to discharge provided for in 523(a)(15), the relief which he has requested in the present proceeding pursuant to that section must be denied.[7]  What is left to decide is whether the debts are dischargeable against Mr. Antonio.

The issue then is, do either the exceptions in section 523(a)(15) apply.  The first is whether Ms. Franklin has the ability to pay the debts.  If she does not, then the debts will be dischargeable.

### 2.  Mrs. Franklin Does Not Have the Ability to Pay the Debts from Income or Property Not Reasonably Necessary for Her Support of that of Her Family

Under section 523(a)(15)(B), if a debtor proves that he or she, "does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor...," then the debt is dischargeable.  Based on the evidence, the Court finds that the debtor has satisfied that burden here and that the disputed debt should be discharged.

The evidence reflects that Mrs. Franklin usually works 40 hours a week and brings home wages of approximately $1822 a month.  Plaintiff's Exhibits 16 & 17.  According to the evidence, Mr. Franklin ordinarily works 40 hours a week and brings home wages of approximately $1900 a month.  The Franklins' combined net total monthly income is therefore ordinarily about $3,722.[8]  Except for one week of vacation time Mr. Franklin receives each year, neither he nor Mrs. Franklin are paid if they are unable to work.

Mrs. Franklin's two children live with her and Mr. Franklin all of the time.  Mr. Franklin has two minor children from a previous marriage.  He shares joint custody of those children with their mother.  They live with him and Mrs. Franklin every other week.

---

[7] But even if he does, as the remainder of this opinion explains, Mrs. Franklin has proven that she does not have the ability to pay the debt, therefore the debt is dischargeable under section 523(a)(15).

[8] It is common, and this Court believes appropriate, to consider the non-debtor's income in making determinations under section 523(a)(15).  See In re Gill, 326 B.R. 611 (Bankr. E.D. Va. 2005).

15

Mrs. Franklin itemized roughly $4,208 in living expenses which she and her husband must pay each month for the maintenance and support of them and the four children. Those expenses included:

— a $615 house payment

— $140 for electricity

— $42 for cable television

— $38 for water

— $55 for telephone service

— $150 for cell phone service

— $100 for home maintenance and repair

— $725 for food

— $50 for health and beauty supplies

— $100 for clothing

— $150 for medical and dental expenses

— $350 to put gasoline in their two cars

— $400 for recreation, which includes the payments on a camper and a four wheeler

— a $423 payment on the truck driven by Mr. Franklin

— $250 in school related expenses for the children

— $191 for car insurance

— $100 that Mr. Franklin pays in child support to his ex-wife

— $185 for child care

— $120 to feed and care for animals (the Franklins live on a farm with chickens, pigs, a horse and several dogs)

— $10 for garbage pick-up

16

— $14 for continuing professional education expenses

Plaintiff's Exhibit 19.

Neither Mr. Mahaffey nor Mr. Antonio submitted any evidence that any of the Franklins' monthly living expenses are not reasonable, or necessary, or reasonably necessary for the maintenance and support of themselves and their children. However, an issue was raised in regard to the $260 expense the Franklins pay each month for a camper. This Court notes that the camper payment is included in the $400 that the Franklins' have allotted for recreation for their family of six. $400 a month for a family of six, which is less than $70 a month per person, is reasonable especially given that the Franklins' list of monthly expenses otherwise includes nothing for holidays, vacations, birthdays and the like. Indeed, it is apparent from the Mrs. Franklin's testimony that their recreation needs are simple and do not involve lavish or even intemperate spending. Mrs Franklin testified:

Q.      What kind of entertainment do you all – on a weekend or any time for you and the children, all four of them, what sort of entertainment expenses do you incur?

A.      Very little if we do anything. Occasionally we – we went camping that one time. When they were out of school, we camped out at our house because we didn't have the expense to  pay for anywhere. So we just camped out at the house and the kids played and we had little bonfires and stuff. But as far as going anywhere, movies, skating, we do not do that.

Q.      Okay. What do you do, if anything, with the boys on the weekends that they are with you?

A.      Most of the time we stay at the house. They have company or friends over or we go to a friend's house. You know, we may go to the park or something like that, but we do not have excess to spend on going to places like that.

Transcript at 122.

Even without the camper, the Franklins would be justified in spending $400 each month for recreation. And that amount is not rendered any less reasonable or necessary just because the camper payment is included in it. Moreover, the Court can see how the camper may actually save the Franklins money each year by their not having to stay in motels when they go on trips.[9]

_____

[9] Are those who otherwise might not be able to pay a debt entitled to spend limited funds on recreation? This Court believes so, and believes that such an expense is part of what is required for a minimal standard of living. In In re Ivory, 269 B.R. 890 (Bankr. N.D. Ala. 2001), a dischargeability case about a student loan, this Court wrote:

17

All things considered, it is reasonable to conclude that the Franklins' list of monthly expenses, from an objective standpoint, is unreasonably austere. It contains no monthly allotment for unexpected or unanticipated expenses which common experience teaches often consume an inordinate percentage of a family's income. Such a situation could overrun the Franklins. Mrs. Franklin testified:

> Q. Okay. Each month you testified that you were the person in your house that pays your bills. In this list of expenses, did you make any allowances for emergencies?
>
> A. No. This is basically about what I pay each month for everything. If we have, for instance, my surgery, I have no idea how much this is going to be. Our insurance is eighty/twenty, so I owe twenty percent right now on all of –
>
> Q. And you don't know how much that medical bill will be?
>
> A. No.

---

This Court believes that a minimal standard of living in modern American society includes these elements:

1. People need shelter, shelter that must be furnished, maintained, kept clean, and free of pests. In most climates it also must be heated and cooled.

2. People need basic utilities such as electricity, water, and natural gas. People need to operate electrical lights, to cook, and to refrigerate. People need water for drinking, bathing, washing, cooking, and sewer. They need telephones to communicate.

3. People need food and personal hygiene products. They need decent clothing and footwear and the ability to clean those items when those items are dirty. They need the ability to replace them when they are worn.

4. People need vehicles to go to work, to go to stores, and to go to doctors. They must have insurance for and the ability to buy tags for those vehicles. They must pay for gasoline. They must have the ability to pay for routine maintenance such as oil changes and tire replacements and they must be able to pay for unexpected repairs.

5. People must have health insurance or have the ability to pay for medical and dental expenses when they arise. People must have at least small amounts of life insurance or other financial savings for burials and other final expenses.

6. People must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet.

Id. at 899.

18

Q.    What about if the children were to get sick and required to be hospitalized?

A.    I would owe twenty percent. I mean they are on the same type of insurance, **but there would be no cushion – I mean, these are my bills and the money that it takes for us to live on each month**. And if we have a car – our car is broken down now.

Q.    I was about to ask you. Do you have any other large expenses right now that you are facing that you don't have the money for?

A.    Yes. My car is broke down. Miraculously, on the way home from the hospital.

Transcript at 119-20 (emphasis added).

Based on the above, assuming Mr. Antonio makes his full $480 child support payment to Mrs. Franklin each month, and that she and her husband work 40 hours every week, they will have only $4,202 to pay their monthly bills, which total at least $4,208. It is therefore apparent that Mrs. Franklin would not have, "income... not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor" from which she can satisfy her obligation to pay the debt or indemnify Mr. Antonio with respect to one-half of the America's First debt.

The Franklins' recent financial calamities illustrate the point. The clutch in Mr. Franklin's truck went out and he had to pay $800 to have it repaired. Mrs. Franklin recently missed a week from work due to surgery and will have to miss another week to recuperate. Mr. Franklin missed two days from work because of his wife's surgery. And Mrs. Franklin well-worn Saturn automobile, which has more than 150,000 miles on it, broke down as she was driving it home from the hospital.

The Franklins' list of monthly expenses does not include anything to account for the substantial expenses that they will have to pay, and money which they have lost, as a result of those incidents. Moreover, it contains no provision for similar unpredictable expenses which they are certain to incur in the future. Consequently, the budget cannot be considered as accurately reflecting the Franklins' actual monthly living expenses.

Similarly, Mrs. Franklin's list of monthly expenses reflects a one time $25 expense for an oil change. It also contains a one time $800 expense attributable to the repairs which had to be made to Mr. Franklin's truck. However, it contains no monthly allowance for regular car maintenance and repair. Everyone who owns an automobile must periodically pay for oil changes, lubrication, breaks, tires, windshield wipers, transmission service and other things required to keep it operating. Moreover, automobiles breakdown and suffer mechanical malfunctions, which require them to be repaired. The Franklins' failure to include a monthly allotment in their budget for car maintenance and repair does not mean that they do not incur those types of expenses, as demonstrated by the repairs required on Mr. Franklin's truck, and the need to repair

19

or replace Mrs. Franklin's Saturn. And their failure to provide for the inevitable incurrence of those types of expenses in their projected budget renders that budget unrealistically low.

In addition, the Franklins have not budgeted for life insurance, vacations, holidays, birthdays, charitable donations, savings, or investments. It does not include an allowance for Mrs. Franklin to obtain an automobile if it is not economically feasible for them to repair it.

It is difficult to imagine satisfying the Franklins real expenses on what they have budgeted each month for anticipated expenses. Their budget contains $140 for electricity. But it contains nothing for gas. Do they heat and cool their home with electricity? If they do, $140 per month seems unreasonable.

The Franklins have budgeted $150 a month for medical and dental expense that are not covered by their health insurance, (which requires them to pay the cost of 20% of all covered services.) Mrs. Franklin made it clear that the $150 estimate is bare. It reflects what she and her husband ordinarily have to pay when everyone in the family is relatively well, and it does not reflect the inevitable potentiality of sickness and injury and the concomitant expenses they will incur in dealing with those expenses.

The Franklins have budgeted $100 a month for home maintenance; $50 a month for health and beauty supplies; $100 a month for clothing; and $185 a month for child care. These too appear to be austere. But for the fortuity of having a relative who assists with child care, such an expense would be much greater for the Franklins. Moreover, a family of six should be considered lucky if they only have to spend $50 a week on shampoo, deodorant, soap, shaving supplies, and the like. And how could the Franklins consistently maintain their house and yard on only $100 a month? What about major maintenance and unexpected repairs?

The fact that the Franklins' budget projections may be considered unreasonable is substantiated by their present financial difficulties. Mrs. Franklin testified:

Q.  Tell the judge, if you will, what your present living situation is.
A.  Right now, I have been off of work for a week which my check this period is four hundred dollars short and will be that way next pay period, as well, because I am going to miss roughly eight days of work. I have been off since last Wednesday with this. The surgery was done on Friday.
     ....

Q.  At this time today are you behind on any bills?
A.  Yes, every single one.
Q.  Okay. Would this be due to what?

| A. | To me being off of work and my surgery. My house payment and the camper and all of that, they are all due at this moment. |
|---|---|
| Q. | Each month, each two weeks when you have your pay check and he has his pay check and you write your bills, approximately how much money is left in your checking account? |
| A. | Very little. Maybe fifty, a hundred dollars. |
| Q. | Would it be a hundred dollars or less? |
| A. | Yes. |

Transcript, pages 108; 121-122.

The plaintiffs argue that the Court should consider the Franklins $5,197 tax refund from last year. The plaintiffs contend that refund demonstrates that the Franklins have at least that much in annual disposable income from which Mrs. Franklin could pay her half of the America's First debt. First, that amount would of course have to be offset by Mr. Antonio's failure to pay $1,770 in child support for February, March, April, and May of the same year. Second, there is no guarantee that the Franklins will receive a similar refund next year or any year thereafter. Third, the fact that the Franklins are presently experiencing financial difficulty despite having received the tax refunds belies the plaintiffs' contention. And, fourth, according to the evidence, the Franklins used the tax refunds to pay expenses that were reasonably necessary for the support of them and their children. Mrs. Franklin testified:

| Q. | And what did you use any of that money for? |
|---|---|
| A. | He had to build a fence. |
| Q. | Just tell the court real quickly about what you used most – |
| A. | I had to buy summer clothes for the children. The money went for that. And we had to paint the inside. We did that ourselves, and I put back a little bit of money for us to go on vacation. |
| Q. | And what did you do for vacation? |
| A. | We went in the camper with the children in June to the beach. |

Transcript at 117. That fact suggests that if the Franklins happen to receive similar refunds in future years, they will, more probably than not, have to spend those tax refunds on expenses that are reasonably necessary for the support of them and their children. That conclusion is supported by the fact that, as explained above, Mrs. Franklin's estimation of their monthly expenses is unreasonable. Thus, even if the Franklins were to receive similar refunds in future years, those refunds would be consumed by expenses which they will have to pay to support themselves and their children.

The term "reasonably necessary" clearly reflects Congress's intention that a debtor not be required to live in a state of financial deprivation or a hand to mouth existence as the price of discharging a 523(a)(15) debt. It has been asked, "Can't everyone pay just a little more?" That question may be answered, "A debtor's ability to

pay is a function of the level of sacrifice demanded." Teresa A. Sullivan, et al., As We Forgive Our Debtors 200 (1989).

The Franklins' overly austere expenses does not accurately reflect their financial needs and what they can reasonably be expected to expend monthly on the average to support themselves and their children. Other than relinquishing the camper, the plaintiffs have offered no suggestion as to how or how much the Franklins can pare down their expenses. And even if they did not have the camper, it is unlikely that they could spend less than the $400 which they have budgeted each month for recreation, which includes the cost of the camper, given the eminent reasonableness of that figure for a family of six.[10] And even if they did not spend any money on recreation, the difference would most likely be consumed with all of the expenses described above that the Franklins either did not list, put in their budget, or estimated too low.

In short, the only way Mrs. Franklin can pay her half of the debt now owed to Mr. Mahaffey is to take from income she and Mr. Franklin need to support their family. The Bankruptcy Code does not require them to do that. Moreover, even if the Franklins' expenses could possibly be pared even a little, the computations advanced by the plaintiffs assume for their validity that neither of the Franklins miss any work. That assumption is, of course, unreasonable. Everyone misses work for illness, deaths of family members or friends, family emergencies, doctor and dentist visits, and similar circumstances.

Notwithstanding the above, the only evidence before the Court is that the expenses claimed by the Franklins are reasonably necessary for the support and maintenance of themselves and their children. Moreover, there is no evidence that those expenses are not reasonably necessary for the support and maintenance of Mr. and Mrs. Franklin and their children. And since the Franklins' combined income, even with the addition of the child support that Mrs. Franklin should receive each month from Mr. Antonio, is insufficient to pay those expenses, the Court must conclude that Mrs. Franklin has no income which is not reasonably necessary to be expended for the maintenance or support of the her or her dependents. Consequently, her obligation to pay one-half of the America's First debt, now held by Mr. Mahaffey, and to indemnify Mr. Antonio and hold him harmless with respect to one-half of that debt, is, by virtue of 11 U.S.C. § 523(a)(15)(A), dischargeable.

Because the Court finds that Mrs. Franklin has proven that she does not have the ability to pay the debts, that is she has proven that one of the exceptions of section 523(a)(15) applies, the Court need not consider the other exception to section 523(a)(15). The statute is clearly couched in the alternative.[11]

---

[10] See note 9 above.

[11] See note 4 above.

22

## C. Section 727 and the Debtor's Discharge

Section 727 of the Bankruptcy Code, 11 U.S.C. § 727, allows a court to deny a debtor a discharge if certain conditions are proven. Included in those conditions are where a debtor conceals assets or makes a false oath or account.

While the plaintiffs did not specifically ask this Court to deny the debtor's discharge pursuant to section, they argue that Mrs. Franklin's failure to disclose on her bankruptcy petition the income she is supposed to receive as child support from Mr. Antonio, was an intentional attempt to mislead someone. While they do not say who was to be misled, the Court must note that both Mr. Mahaffey and Mr. Antonio knew that the latter had an obligation to pay child support to Mrs. Franklin. Therefore, Mrs. Franklin could not have intended to mislead them. The entity that Mrs. Franklin would have misled could not have been the Court since the Court would have had no reason to look at the schedule, but for the plaintiffs having filed their adversary proceeding. Similarly, it could not have been the trustee or Mrs. Franklin's creditors, since they are not, under any scenario, entitled to share in those child support payments.

In regard to the substance of the allegation, it is not otherwise apparent what Mrs. Franklin could have possibly hoped to gain by not disclosing the child support, unless it was to avoid a 707(b) inquiry. But that is improbable, since the evidence which she presented at trial clearly demonstrates that she and her husband have no disposable income from which she could repay her debts. Consequently, it cannot be concluded that she was intentionally trying to mislead anyone.

Furthermore, when Mrs. Franklin filed her bankruptcy petition, along with her statement of income on February 9, 2005, she had not received any child support from Mr. Antonio for February. And she was ostensibly aware of the fact that Mr. Antonio had lost his job. Therefore, she had the right to assume that she would not receive child support in February, and that she may not receive it in the future, until Mr. Antonio found other employment. The correctness of that assumption is supported by the fact that Mr. Antonio made no child support payments in February 2005, March 2005, or May 2005. And he made only a partial payment in April. Consequently, Mrs. Franklin's Schedule I was, when she filed it, entirely accurate. She was not receiving child support.

Based on the above, the Court concludes that Mrs. Franklin's failure to list the child support did not demonstrate a lack of honesty or candor, and none can be implied.

## VII. Conclusion

Based on the above, the Court concludes the debt which Mrs. Franklin owes to Mr. Mahaffey by virtue of his payment of the America' First note, and her obligation to indemnify Mr. Antonio with respect to one-half of that debt, are dischargeable in her Chapter 7 case.

Case 05-00158-BGC     Doc 31     Filed 03/29/06     Entered 03/29/06 14:36:00     Desc Main
Document        Page 23 of 24

A separate order will be entered in conformity with that conclusion.

Dated  March 29, 2006                    /s/Benjamin Cohen
                                         BENJAMIN COHEN
                                         United States Bankruptcy Judge


BGC:sm

24